*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MICHAEL J. COOPER and CENTRAL PLUMBING & HEATING, | ) ) ) | Supreme Court No. S-15554 |
| | ) | Superior Court No. 3AN-09-06600 CI |
| Appellants, | ) | |
| | ) | O P I N I O N |
| v. | ) | |
| | ) | No. 7016 – June 26, 2015 |
| SAMUEL L. THOMPSON, | ) | |
| | ) | |
| Appellee. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Sen K. Tan, Judge.

Appearances:  Matthew D. Regan and Alex Vasauskas, Holmes Weddle & Barcott, P.C., Anchorage, for Appellants. Marc W. June, Law Offices of Marc June, Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.

## I.     INTRODUCTION

In December 2008 Michael Cooper caused a car accident that injured Samuel Thompson.  During the second trial on compensatory damages the superior court excluded any evidence that Thompson had been assaulted by his then-girlfriend after the accident and limited the testimony of a defense expert witness.  The superior court also

delivered an instruction on liability for additional harm to which Cooper objected. The jury returned a $1,458,430 verdict in favor of Thompson, which exceeded his offer of judgment and thus entitled him to an award of attorney's fees under Alaska Civil Rule 68. The superior court calculated Thompson's fee award based on the contingency fee agreement he had entered into with his attorney. Cooper and his employer appeal the trial court's evidentiary rulings, jury instruction, and fee award. We reverse the complete exclusion of the evidence that Thompson had been assaulted because it was relevant to his claim of continuing injury suffered as a result of the car accident, and we remand for a new trial.

## II.    FACTS AND PROCEEDINGS

This is the second appeal arising out of this litigation. We provided this overview in our previous decision:

> In December 2008 Michael Cooper caused a car accident that injured Samuel Thompson. Thompson sued Cooper and Cooper's employer[, Central Plumbing & Heating, collectively "Central,"] for compensatory and punitive damages. The jury returned a verdict for Thompson for compensatory damages, but not for punitive damages. The parties appeal[ed] rulings on evidentiary issues, jury instructions, and denied motions. We affirm[ed] most of the superior court's rulings, but we reverse[d] its (1) exclusion of Thompson's treating physicians' opinion testimony on medical causation, and (2) denial of a jury instruction on additional harm. We remand[ed] for a new trial on compensatory damages.[1]

The new trial occurred in December 2013. The jury returned a verdict for Thompson. Central appeals two evidentiary rulings, one jury instruction, and awards of attorney's fees under Alaska Civil Rules 40(e)(2) and 68.

---

[1]    *Thompson v. Cooper*, 290 P.3d 393, 395 (Alaska 2012).

## III.   STANDARDS OF REVIEW

### A.   Evidentiary Rulings

"A superior court's decision whether to admit evidence under Evidence Rule 403 requires it to balance the probative value of the evidence against its unfair prejudice; we review this balancing for abuse of discretion."[2]  "When reviewing the exclusion of evidence under Evidence Rule 403 as unfairly prejudicial, we first 'consider the relevance of the excluded evidence and then determine whether the superior court's exclusion of it constitutes a clear abuse of discretion.' "[3]  "We review a trial court's ruling on the admissibility of expert testimony for abuse of discretion."[4]  "We will find an abuse of discretion when the decision on review is manifestly unreasonable."[5]

"An erroneous decision regarding admissibility will only be reversed 'if it affected the substantial rights of a party.' "[6]  "When the trial court has erroneously excluded evidence, a party must show that the error was harmful or prejudicial before we will reverse the trial court."[7]

---

[2]     *Pouzanova v. Morton*, 327 P.3d 865, 867 (Alaska 2014) (footnote omitted).

[3]     *Kingery v. Barrett*, 249 P.3d 275, 285 (Alaska 2011) (alterations and omission omitted) (quoting *Liimatta v. Vest*, 45 P.3d 310, 313 (Alaska 2002)).

[4]     *State v. Coon*, 974 P.2d 386, 398 (Alaska 1999).

[5]     *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, ___ P.3d ___, Op. No. 7003 at 7, 2015 WL 1958657, at *3 (Alaska May 1, 2015).

[6]     *Barton v. N. Slope Borough Sch. Dist.*, 268 P.3d 346, 349 (Alaska 2012) (quoting *Cartee v. Cartee*, 239 P.3d 707, 721 (Alaska 2010)).

[7]     *Id.* at 353.

## B. Jury Instructions

"Where a party has objected to a jury instruction in accordance with Rule 51(a), '[t]he correctness of jury instructions is reviewed de novo.' "[8] "An instruction that sets out an incorrect or incomplete statement of the applicable law amounts to reversible error only if it causes substantial prejudice to a party — that is, only 'if it can be said that the verdict may have been different had the erroneous instruction not been given.' "[9] "We evaluate whether any error was prejudicial by putting ourselves in the position of the jurors and determining whether the error probably affected their judgment."[10]

## C. Attorney's Fees

"We review awards of attorney's fees for abuse of discretion and will reverse 'if the award is arbitrary, capricious, manifestly unreasonable, or improperly motivated.' "[11] We "review de novo issues concerning the interpretation of civil rules, 'adopting the rule of law that is most persuasive in light of precedent, policy and reason.' "[12]

---

[8] *Brown v. Knowles*, 307 P.3d 915, 923 (Alaska 2013) (alteration in original) (quoting *Ayuluk v. Red Oaks Assisted Living, Inc.*, 201 P.3d 1183, 1197 n.30 (Alaska 2009)).

[9] *Parnell v. Peak Oilfield Serv. Co.*, 174 P.3d 757, 765 (Alaska 2007) (quoting *Reich v. Cominco Alaska, Inc.*, 56 P.3d 18, 25 (Alaska 2002)).

[10] *Zamarello v. Reges*, 321 P.3d 387, 392 (Alaska 2014) (quoting *Henrichs v. Chugach Alaska Corp.*, 250 P.3d 531, 535 (Alaska 2011)).

[11] *Roderer v. Dash*, 233 P.3d 1101, 1106 (Alaska 2010) (quoting *Rhodes v. Erion*, 189 P.3d 1051, 1053 (Alaska 2008)).

[12] *Okagawa v. Yaple*, 234 P.3d 1278, 1280 (Alaska 2010) (internal quotation marks omitted) (quoting *Cook Schuhmann & Groseclose, Inc. v. Brown & Root, Inc.*, 116

(continued...)

## IV. DISCUSSION

### A. Evidence Of The Domestic Violence Assaults Against Thompson

#### 1. Factual and procedural background

The car accident occurred in late December 2008.[13] During the following months Thompson complained of neck and lower back pain, and he underwent a diagnostic procedure in April 2009 and disc replacement surgery in May 2009.[14] During this period Thompson was dating a woman named Amy Christiansen.[15]

In July 2009 Thompson petitioned for and received a protective order against Christiansen. In the ex parte proceeding Thompson described a July 23, 2009 incident of domestic violence in which Christiansen punched and kicked him, as well as an earlier incident in which Christiansen stood on him and choked him. He did not specify the date of the earlier incident during the ex parte hearing, but he did report that it occurred after his back injury. At a hearing on the admissibility of this domestic violence evidence during the first trial, he clarified that the choking incident occurred in July 2009.

Before the first trial Thompson moved to exclude all evidence of domestic violence against him. The superior court ruled that evidence of domestic violence could not be admitted without prior clearance from the court that it was permissible under Evidence Rule 403. At the first trial Central questioned Thompson about the domestic violence outside the presence of the jury, and the superior court ruled that the testimony

---

[12](...continued)
P.3d 592, 597 (Alaska 2005)).

[13]     *See Thompson v. Cooper*, 290 P.3d 393, 395 (Alaska 2012).

[14]     *Id.* at 396.

[15]     *Id.* at 395.

would not be admitted. The court explained that it found Thompson's testimony that the domestic violence did not occur until after the surgery credible and concluded that the probative value of evidence about domestic violence would be outweighed by the evidence's danger of unfair prejudice.

During the first trial Thompson testified that although he felt pain in his neck and shoulders shortly after the accident, that pain had since ended, leaving only the pain in his lower back, or lumbar spine. Following our remand Thompson was deposed again. During his second deposition he testified that he was experiencing pain in his shoulders and neck, or cervical spine, as well as headaches and the pain in his lower back. Thompson testified about this pain at the second trial, and his experts testified that he had herniated discs in both his lumbar spine and cervical spine.

Before the second trial Thompson moved that the superior court's order excluding evidence of domestic violence absent prior clearance from the court be extended to the second trial. Central opposed and cited the cervical disc injuries that Thompson claimed in the second trial but not the first as reason to revisit that ruling. The superior court granted Thompson's motion and again ruled that evidence of domestic violence was "highly prejudicial" and would be "subject to a balancing test under Evidence Rule 403 before it may be admitted."

During Thompson's case-in-chief in the second trial several expert witnesses testified about whether the accident was the likely cause of Thompson's injuries. Three of the witnesses were asked to describe the likelihood that the accident had caused the injuries "assuming no significant intervening trauma." All three answered that the accident was the most likely cause.

During cross-examination of one of Thompson's treating physicians, Dr. Allison Hanna, Central asked whether choking could cause cervical disc herniation. She answered that it could. Central elicited similar testimony from one of its own expert

witnesses, Dr. James Blue, who testified that the act of fighting off a choking attempt could cause cervical disc herniation.

Central then stated its intention to call Thompson and "ask Mr. Thompson if he had been choked at some point — without identifying who the source was, if he had been choked at some point after the accident, but prior to July 23rd of 2009," the date of the incident of domestic violence that led Thompson to seek a protective order. Central argued that the references to the absence of significant trauma other than the accident in the questioning of Thompson's experts had opened the door to evidence about the incidents of domestic violence.

The superior court held a hearing outside the presence of the jury and ordered briefing. Thompson argued that the evidence should be excluded either as more unfairly prejudicial than probative under Evidence Rule 403 or based on Central's failure to implead Christiansen as required by AS 09.17.080.[16] Central argued that AS 09.17.080 was not applicable because "this case does not present a question of apportionment of fault" because "any spinal injury Mr. Thompson sustained or developed was due to other causes, including domestic violence, which are distinct, separate, and unrelated to the accident or to the medical treatment for injuries sustained in the accident."

The superior court, relying on our decision in *L.D.G., Inc. v. Brown*,[17] ruled that AS 09.17.080 applied and prevented Central from arguing that Christiansen bore any of the responsibility for Thompson's injuries. It alternatively ruled that the evidence of domestic violence was inadmissible under Evidence Rule 403 because the petition and

---

[16] *See* AS 09.17.080(c) (requiring, in certain circumstances, that fault be allocated only among the parties participating in a lawsuit).

[17] 211 P.3d 1110 (Alaska 2009).

ex parte protective order did not mention any injuries or medical treatment associated with the domestic violence assault incidents, and because the topic of domestic violence was so sensitive, with high potential for unfair prejudice. The superior court therefore ruled that Central could not elicit any evidence of the domestic violence assaults against Thompson.[18]

### 2. Central did not waive this matter on appeal by failing to appeal a similar ruling in the first trial.

Thompson argues that our rule against expanding issues on successive appeals bars Central's appeal in this case because Central did not appeal the superior court's exclusion of all evidence that Thompson had suffered a domestic violence assault in the first trial. We disagree.

We have previously refused to consider appeals of legal determinations that could have been before us but were not argued in earlier appeals.[19] But the rule against expanding issues on successive appeals is not a bar in this case. Although we decided one evidentiary issue in the first appeal,[20] we left "the determination of [other appealed] evidentiary issues to the future discretion of the superior court."[21] Evidentiary rulings,

---

[18] Thompson argues that the superior court could also have considered the timing of Central's application to admit the domestic violence evidence as a reason to deny that application. But the superior court specifically declined to rely on that basis and instead limited its ruling to the dual grounds of AS 09.17.080 and unfair prejudice under Evidence Rule 403.

[19] *See, e.g.*, *Villars v. Villars*, 336 P.3d 701, 711 (Alaska 2014).

[20] *See Thompson*, 290 P.3d at 399-400 (deciding that testimony of treating physicians was improperly excluded).

[21] *Id.* at 401 (leaving the admissibility of evidence of Thompson's alleged drug abuse and FDA approval of Thompson's surgery "to the future discretion of the superior court").

unlike purely legal matters,[22] are context-dependent and made with an eye to how a case has developed.[23] This case provides an apt example. Central argues that the evidence of domestic violence was particularly relevant to injuries Thompson reported at the second trial but not the first. In light of the different evidence presented in the two trials, an exclusion of evidence that might have been correct or harmless if wrong in the context of the first trial could be significantly more consequential in the context of the second. Given that possibility, the rule against expanding issues on successive appeals does not bar this issue on appeal.

### 3. Alaska Statute 09.17.080 does not require that defendants join parties whose alleged fault is not related to the incident at issue in the action.

"Although we ordinarily review the decision whether someone is an indispensable party for an abuse of discretion, the decision in this case depends upon the interpretation of a statute, which we decide de novo."[24]

"Under AS 09.17.080, a jury may not allocate fault to a third party unless that third party has been joined as a defendant, with certain exceptions not relevant

---

[22] *See State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 873-74 (Alaska 2003) (refusing to consider statutory sovereign immunity argument).

[23] *See, e.g.*, *Schofield v. City of St. Paul*, 238 P.3d 603, 609 (Alaska 2010) (declining to express any opinion on additional appealed evidentiary issues once one required remand "[b]ecause it is unknown what specific evidence will be introduced on remand and what objections might be raised").

[24] *Pouzanova v. Morton*, 327 P.3d 865, 867 (Alaska 2014) (footnote omitted).

here."[25] This statute's purpose is to ensure that fault for an incident is accurately litigated by preventing a party from blaming an "empty chair" defendant for the injuries at issue.[26]

The superior court ruled that AS 09.17.080 applied to this case without the benefit of our subsequent decision in *Pouzanova v. Morton*.[27] In *Pouzanova* the trial court allowed the defendant to elicit testimony about domestic violence the plaintiff had suffered at her husband's hands to demonstrate that some of the plaintiff's non-economic loss was attributable to her domestic situation and not solely to the accident at issue.[28] We affirmed the decision to allow such testimony without joining the husband and explained that "it is only fault for the incident at issue that is being allocated among potentially responsible parties" under AS 09.17.080.[29] Because the defendant's theory was that some of the plaintiff's claimed damages were due to conduct entirely unrelated to the automobile accident at issue, "the district court was correct in ruling that [the plaintiff]'s husband did not have to be joined as a third-party defendant."[30]

*Pouzanova* controls the result in this case. Central was clear at trial that it viewed Christiansen's actions as "potentially a new, distinct, and separate cause" of Thompson's cervical disc herniation. Unlike the defendant in *L.D.G., Inc. v. Brown*,[31]

---

[25]     *Id.* at 869.

[26]     *See Alaska Gen. Alarm, Inc. v. Grinnell*, 1 P.3d 98, 102-04 (Alaska 2000).

[27]     327 P.3d 865 (Alaska 2014).

[28]     *See id.* at 869-70.

[29]     *Id.* at 870.

[30]     *Id.*

[31]     *See* 211 P.3d 1110, 1121-22 (Alaska 2009) (affirming exclusion of evidence of intoxicated bar patron's role in fatally shooting decedent).

the case on which the superior court relied, Central did not argue that Christiansen bore "fault for the incident at issue,"[32] and thus AS 09.17.080's apportionment rules were inapplicable. The superior court erred in its ruling that this statute required the exclusion of the domestic violence evidence based on Central's failure to join Christiansen.

### 4. The wholesale exclusion of domestic violence evidence as more unfairly prejudicial than probative was an abuse of discretion.

"Under Rule 402, our 'Rules of Evidence start from the proposition that all relevant evidence is admissible.' "[33] Alaska Evidence Rule 403 provides an exception: "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The trial court has "broad discretion in applying this balancing test."[34] When we review the exclusion of evidence under Evidence Rule 403 as unfairly prejudicial, "we first consider the relevance of the excluded evidence and then determine whether[, in light of its prejudicial effect,] the superior court's exclusion of it constitutes a clear abuse of discretion."[35]

The excluded evidence was relevant. Thompson's petition for a protective order described a July 23, 2009 incident in which Christiansen punched him in the face multiple times and kicked him in the ribs. The petition also alleged that two days later

---

[32] *Pouzanova*, 327 P.3d at 870.

[33] *City of Bethel v. Peters*, 97 P.3d 822, 826-27 (Alaska 2004) (quoting *United States v. Cruz-Garcia*, 344 F.3d 951, 954 (9th Cir. 2003)).

[34] *Schofield v. City of St. Paul*, 238 P.3d 603, 608 (Alaska 2010).

[35] *Kingery v. Barrett*, 249 P.3d 275, 285 (Alaska 2011) (internal quotation marks, alterations, and omission omitted) (quoting *Liimatta v. Vest*, 45 P.3d 310, 313 (Alaska 2002)).

Thompson awoke to Christiansen holding him down, and that she then punched him again. At the protective order hearing Thompson described an incident earlier the same month in which Christiansen stood on top of him as he was lying down and choked him with both hands. In both the protective order hearing and the second trial, Thompson testified that he had not needed medical treatment as a result of the incidents with Christiansen.

At the second trial the cause of Thompson's injuries "was the central issue," just as it had been in the first trial.[36] Central elicited testimony from one of Thompson's expert witnesses and one of its own that being choked and fighting off being choked can cause cervical disc herniation. The excluded evidence that Thompson was choked thus "go[es] to the core" of Central's defense regarding the cause of Thompson's cervical injuries.[37] More importantly, several of Thompson's expert witnesses were asked to evaluate the likelihood that the automobile accident caused Thompson's injuries "*assuming no significant intervening trauma.*" Prohibiting reference to the documented assaults on Thompson thus denied the jury evidence relevant to determining the cause of Thompson's unresolved cervical injuries and relevant to evaluating the weight of several witnesses' testimony. The excluded evidence did not explain all of Thompson's injuries, but the explanation for the severity and persistence of his cervical injuries was a "fact that is of consequence to the determination of the action," and evidence does not need to be dispositive to be relevant.[38] In light of the importance of causation in this

---

[36] *Thompson v. Cooper*, 290 P.3d 393, 400 (Alaska 2012).

[37] *Schofield*, 238 P.3d at 608.

[38] Alaska R. Evid. 401.

trial, it is not possible to reliably conclude "that the jury was not substantially swayed or affected by the [exclusion]."[39]

Having evaluated the excluded evidence's relevance, we turn to whether, in light of the evidence's potential for unfair prejudice, the superior court's exclusion was a clear abuse of discretion.[40] The Commentary to Alaska Rule of Evidence 403 recommends that before excluding evidence trial courts consider alternative means of avoiding unfair prejudice, including limiting instructions and substitute means of proof.[41] In this case the prejudice the superior court identified came from the fact that Thompson was in a domestic relationship with his attacker: The court worried that the jury might believe that Thompson "plays the role of the victim" if it learned that he had stayed in an abusive relationship. But there was a way for the superior court to control how the parties presented evidence to prevent that fact from coming before the jury. As Central proposed to the superior court when it moved during the second trial to introduce evidence of the assaults, Central could have been permitted to question Thompson about being choked "without identifying who the source was." Such a limitation would have both presented the jury with the relevant evidence that Thompson had been assaulted and choked in July 2009 and addressed the risk of "a decision being reached by the trier of facts on an improper basis."[42]

---

[39] *Barton v. N. Slope Borough Sch. Dist.*, 268 P.3d 346, 353 (Alaska 2012) (quoting *Liimatta*, 45 P.3d at 317).

[40] *See Kingery*, 249 P.3d at 285.

[41] *See* Commentary Alaska E. R. 403; *cf. City of Bethel v. Peters*, 97 P.3d 822, 827 (Alaska 2004) (affirming superior court's admission of a report with inadmissible sections redacted).

[42] *Getchell v. Lodge*, 65 P.3d 50, 57 (Alaska 2003) (quoting *Liimatta*, 45 P.3d (continued...)

Because the excluded evidence of the post-surgery assaults went to the core of Central's defense theory and could have been admitted without unfairly prejudicing the jury against Thompson, it should have been admitted. The jury was entitled to put no more stock in this evidence than the superior court appeared to, but the court abused its discretion by wholly preventing Central from asking Thompson about being assaulted and choked so shortly after his surgery. Because the exclusion could have had a substantial influence on the verdict, we remand for a new trial.

### B.    Limitations On Expert Testimony

#### 1.    Factual and procedural background

One of Central's witnesses was Dr. Irving Scher, an expert in biomechanics. Before the second trial Central moved for a ruling that Dr. Scher would be allowed to testify as to his opinion about the causes of Thompson's injuries. Thompson opposed and argued that the superior court's ruling during the first trial that a different biomechanics expert could not testify about causation should apply to Dr. Scher in the second trial. The superior court ruled before the trial that Dr. Scher could not testify as to his opinion about the causes of Thompson's injuries, but also ruled that Central would have an opportunity to make an offer of proof or present testimony on this issue during the trial outside the presence of the jury in order to identify the appropriate limits, if any, on Dr. Scher's testimony.

During the trial Central explained that it sought to call Dr. Scher to present both "scientific testimony" and "experience-based testimony." At a mid-trial hearing outside the presence of the jury, both parties examined Dr. Scher about his qualifications and the basis for his opinions in this case.

---

[42](...continued)
at 315).

The superior court then ruled that Dr. Scher was a "*Daubert*-type, scientific-type expert[]," and that although Dr. Scher could testify about the forces he calculated Thompson had experienced in the accident and compare those forces to the effects of other activities, he could not "testify as to the precise cause of the injury." The court concluded that any testimony about the specific causes of Thompson's injuries would exceed Dr. Scher's biomechanics expertise and amount to a medical diagnosis he was not qualified to make.

When the jury returned the court qualified Dr. Scher as a biomechanics expert and Central questioned him on direct examination. He testified about the materials he examined and software he used to reconstruct the accident and discussed the forces the reconstruction analysis suggested Thompson had experienced. Dr. Scher compared these forces to those experienced during daily activities like walking up and down stairs or lifting boxes, and he testified that the compressive force he calculated Thompson to have experienced in the accident was "lower than or . . . indistinguishable from these other activities." He further testified about the ways disc herniations occur and detailed his search in a National Highway Transportation Safety Administration database of car accidents for accidents comparable to the accident at issue in the case, which he testified revealed 387 similar accidents but no injuries as severe as those Thompson claimed to have suffered.

Thompson's subsequent cross-examination of Dr. Scher started by eliciting his agreement that he was "not testifying about the causes of the specific injury to Mr. Thompson," "not giving opinions as to the injuries to Sam Thompson specifically caused by this motor vehicle accident," and "not giving opinions today as to [whether] Sam Thompson's injuries became worse during his medical treatment." Thompson then cross-examined Dr. Scher on, among other matters, the materials he had used in his accident reconstruction analysis, the forces that analysis suggested Thompson had

experienced, and whether Central would have called him to testify if his testimony had been less favorable.

In his closing argument, Thompson emphasized the limits of Dr. Scher's testimony:

> Dr. Scher very specifically did not address the issue in the case that you're being asked to address. He did not address what Sam Thompson's injuries were in the motor vehicle accident. He did not address how the injuries in the motor vehicle accident led to other complications in time. He did not address the cervical herniations. And so his testimony has very little impact on your questions.

In turn, Central used part of its closing argument to explain the value of Dr. Scher's testimony:

> [B]iomechanics is a separate, distinct, you know, discipline, specialty [from medicine], that addresses issues like what causes injury to different parts of the body, and you saw — this was what Dr. Scher was talking about, the role of injury biomechanics, and he discussed forces of motion, that that's what they were looking at. He did his analysis of the accident, which showed a delta-V of about 6-1/2 miles an hour and talked about the rotational aspects of it.

Central also reminded the jury of Dr. Scher's discussion of the causes of disc injuries and comparison of Thompson's injuries with those reported in the database of similar accidents.

### 2. Central did not waive this matter on appeal by failing to appeal a similar ruling in the first trial.

Thompson argues that our rule against expanding issues on successive appeals bars Central's appeal in this case because Central did not appeal a similar limitation on the scope of Central's biomechanics expert's testimony in the first trial. Review of this evidentiary ruling is not barred by that rule because, as explained above

in Part IV.A.2, evidentiary rulings are context-dependent and made with an eye to how a case has developed. Moreover, although the superior court imposed a similar limitation on expert testimony in both trials, Central's expert in the second trial was not the same expert it retained in the first trial. The fact that Central did not appeal a limitation on one expert's testimony in the context of one trial does not bar it from appealing a limitation on a different expert's testimony in the context of a different trial.

### 3. The superior court's limitation on the scope of Central's biomechanics expert's testimony was not an abuse of discretion.

Both parties approach this issue as if it requires us to rule on the admissibility of biomechanical expert testimony as a matter of law. It does not. The superior court qualified Dr. Scher as an expert in biomechanics, and Thompson does not appeal that ruling. What is at issue in this appeal is whether the limitations the superior court placed on Dr. Scher's testimony amounted to an abuse of discretion.

Alaska Rule of Evidence 702 permits qualified expert testimony that "will assist the trier of fact to understand the evidence or to determine a fact in issue." We held in *State v. Coon*[43] that the appropriate test for the admissibility of scientific expert testimony is the test set out by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[44] "[A]t its most basic level *Daubert* contains two essential requirements for the admission of scientific expert testimony: it must be reliable and it must be relevant."[45] Adopting this approach to expert testimony is a means of ensuring

---

[43] 974 P.2d 386, 394 (Alaska 1999).

[44] 509 U.S. 579, 593-94 (1993).

[45] *Marron v. Stromstad*, 123 P.3d 992, 1003 (Alaska 2005).

that trial courts have "greater flexibility"[46] than was available under earlier approaches to exercise their "wide discretion in . . . admitting expert testimony."[47]

Although the application of Rule 702 expresses a " 'liberal admissibility standard' for expert testimony,"[48] a trial court's power to qualify a witness as an expert in a particular area includes the power to exclude opinions that are beyond the witness's expertise.[49] Trial courts do not need to choose between admitting every opinion an expert witness seeks to introduce and excluding the witness altogether; instead, trial courts have the authority to limit expert witnesses' testimony to the areas within their expertise.[50]

Some courts have qualified biomechanical engineers as expert witnesses but prevented them from testifying about the specific causation of the injuries in the cases at bar.[51] At least one appellate court has found that a trial court abused its

---

[46]    *Coon*, 974 P.2d at 399.

[47]    *Marron*, 123 P.3d at 1001.

[48]    *Id.* at 1002 (quoting *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1034 (Alaska 2002)).

[49]    *See, e.g.*, *Levin v. Dalva Bros.*, 459 F.3d 68, 78 (1st Cir. 2006); *Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1376-77 (M.D. Ga. 2007) ("[E]ven though a proffered expert may be qualified to render some opinions, the court may exclude other opinions if it finds those opinions to extend beyond the expert's area of expertise.").

[50]    *See, e.g.*, *State v. Guinn*, 555 P.2d 530, 544 (Alaska 1976) (affirming trial court's exclusion of part of expert's proposed opinion testimony as "too speculative").

[51]    *See, e.g.*, *Rodriguez v. Athenium House Corp.*, No. 11 Civ. 5534(LTS)(KNF), 2013 WL 796321, at *4-6 (S.D.N.Y. Mar. 5, 2013); *Morgan v. Girgis*, No. 07 Civ.1960(WCC), 2008 WL 2115250, at *6 (S.D.N.Y. May 16, 2008); *Bowers*, 537 F. Supp. 2d at 1377; *Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 501 n.14 (D.N.J. 2002); *Schultz v. Wells*, 13 P.3d 846, 849 (Colo. App. 2000); *Benjamin*

(continued...)

discretion by allowing a biomechanics expert to testify *without* such a limitation on causation testimony.[52]  In contrast, Central has not identified any case in which a trial court was held to have abused its discretion to control expert testimony by imposing a limitation like the one the superior court imposed on Dr. Scher or even by excluding a biomechanics expert altogether.

The testimony Dr. Scher was permitted to present makes it clear that the superior court's limitation was not an abuse of discretion.  The superior court was within its wide discretion to control expert testimony when it allowed Dr. Scher to testify about the forces that a person of Thompson's height and weight would have experienced in a collision between a truck like Thompson's and a truck like Central's that were both moving as they were on the day of the accident and to compare those forces to the forces that result from everyday activities.  The superior court was similarly within its wide

---

[51](...continued)
*v. Appliance & Refrigeration Servs., Inc.*, No. CIV.A. 00C-07-006WLW, 2002 WL 1308405, at *2 (Del. Super. June 7, 2002); *Stockwell v. Drake*, 901 So. 2d 974, 976 (Fla. Dist. App. 2005); *Cromer v. Mulkey Enters., Inc.*, 562 S.E.2d 783, 786 (Ga. App. 2002); *Santos v. Nicolos*, 879 N.Y.S.2d 701, 704 (N.Y. Sup. 2009); *Stedman v. Cooper*, 292 P.3d 764, 767 (Wash. App. 2012) (discussing other cases in which the biomechanics expert witness had testified); *cf. Eskin v. Carden*, 842 A.2d 1222, 1230 (Del. 2004) (requiring a reliable "connection between the reaction of the human body generally to the forces generated by the accident and the specific individual allegedly injured" before a biomechanics expert can be permitted to testify about causation); *Stedman*, 292 P.3d at 769 (affirming exclusion of biomechanics expert who had "disavowed any intention of giving an opinion about whether [the plaintiff] got hurt in the accident" because "his clear message was that [the plaintiff] could not have been injured in the accident because the force of the impact was too small").

[52]    *See Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 305 (6th Cir. 1997) ("[The witness] is not a medical doctor who had reviewed [the plaintiff]'s complete medical history, and his expertise in biomechanics did not qualify him to testify about the cause of [the plaintiff]'s specific injuries.").

discretion to control expert testimony when it ruled that offering a reliable expert opinion as to how those forces affected Thompson himself would require a familiarity with his medical history and physiology that exceeded Dr. Scher's expertise.[53] We therefore affirm the superior court's rulings regarding its limitations on Dr. Scher's testimony.

## C.    Additional Harm Jury Instruction

### 1.    Factual and procedural background

One of the two bases for our remand when this case was first before us was the superior court's failure to instruct the jury on the concept of additional harm.[54] We explained that "[a] tortfeasor is generally liable for the consequences of any resulting injury, as well as any additional harm associated with medical care administered as an adjunct to the original injury."[55] Because the failure to instruct the jury about Central's liability "for any additional harm caused by [Thompson's] doctors' alleged misjudgments" might have resulted in the jury not awarding Thompson the full recovery he was due, we remanded.[56]

At the second trial the superior court rejected the Alaska Pattern Jury Instruction on additional harm.[57] The court pointed out that the pattern instruction

---

[53]    Because we affirm the superior court's limitation on Dr. Scher's testimony we also affirm that it was not plain error for the court to allow Thompson's counsel to elicit the substance of that limitation during cross-examination and to reference that limitation during closing argument.

[54]    *See Thompson v. Cooper*, 290 P.3d 393, 401 (Alaska 2012).

[55]    *Id.* (citing *Lucas v. City of Juneau*, 127 F. Supp. 730, 731-32 (D. Alaska 1955), and RESTATEMENT (SECOND) OF TORTS § 457 (1965)).

[56]    *Id.*

[57]    Alaska Civil Pattern Jury Instruction 20.12 reads (brackets in original):
(continued...)

appeared to limit recovery to additional harm that resulted from negligent medical care for the original injury, leaving out additional harm that might follow from non-negligent medical care. It therefore crafted its own instruction on additional harm:

> A negligent party is generally responsible for the consequences of any resulting injury, as well as any additional harm associated with medical care for the original injury. If you find that defendants were the legal cause of plaintiff's injuries, defendants are also responsible for any additional harm resulting from the acts of others in providing medical treatment or other aid that plaintiff reasonably required, even if those acts were negligently performed. Negligence is the failure to use reasonable care.

Central timely objected to this instruction on the ground that it did not adequately limit the scope of liability to injuries from medical treatment related to the original injury. The superior court noted Central's objection but concluded that the instruction it had written accurately captured the doctrine, and so delivered that instruction to the jury at the close of the trial.

---

[57](...continued)

> If you find the defendant is legally responsible for the (accident), you may award the plaintiff, in addition to compensation for losses resulting from the original injury, (his) (her) losses resulting from:
>
> 1. [Aggravation of the original injury resulting from the failure of (insert name or the word "others") to use reasonable care in providing medical or hospital treatment of the original injury.]
>
> 2. [Aggravation of the original injury resulting from the failure of (insert name or the word "others") to use reasonable care in transporting the plaintiff to a place where medical treatment is available.]

### 2. Any error in the additional harm jury instruction did not prejudice Central.

The superior court had to craft an additional harm jury instruction because the Alaska Pattern Jury Instruction on this point does not accurately capture our law. We have held that the Restatement (Second) of Torts § 457 states the law of liability for additional harm,[58] including in the first appeal in this case.[59] The Restatement provides that

> [i]f the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner.[60]

In contrast, the pattern jury instruction only invites a jury to award damages "resulting from the failure of [a medical provider] to use reasonable care in providing medical or hospital treatment of the original injury."[61] Because the pattern instruction does not reach injuries caused by non-negligent medical care its scope is more limited than our law.

Central argues that the second sentence of the superior court's instruction invited the jury to award more damages than are permitted by our law on additional harm. That sentence instructed the jury that "defendants are also responsible for any

---

[58] *See Gen. Motors Corp. v. Farnsworth*, 965 P.2d 1209, 1217 (Alaska 1998); *cf. Turner v. Municipality of Anchorage*, 171 P.3d 180, 184 & n.8 (Alaska 2007) (describing party's request for an additional harm jury instruction based on Restatement § 457).

[59] *See Thompson*, 290 P.3d at 401 n.30.

[60] RESTATEMENT (SECOND) OF TORTS § 457 (1965).

[61] Alaska Civil Pattern Jury Instruction 20.12.

additional harm resulting from the acts of others in providing medical treatment or other aid that plaintiff reasonably required, even if those acts were negligently performed." Central's view is that, based on this instruction, the jury may have held Central liable for damages stemming from medical treatment Thompson required for reasons unrelated to the accident.

Only by interpreting the second sentence of the instruction in isolation could a jury have misunderstood the law in the way Central claims. The first sentence explained that "[a] negligent party is generally responsible for the consequences of any resulting injury, as well as any additional harm associated with medical care for the original injury." Central was also able to clarify the applicable standard in its closing argument, when it told the jury that a plaintiff "can only recover additional harm for treatment for the original injury." Although the instruction could have been more clear that only medical care related to the original injury can contribute to a tortfeasor's liability, if we put ourselves in the position of the jury we cannot say that the lack of clarity in one sentence probably affected its judgment.[62]

Because Alaska Civil Pattern Jury Instruction 20.12 is more limited than our law on additional harm, a trial court should not deliver it in cases where an additional harm instruction is appropriate. Instead, the trial court should instruct the jury that if the jury decides that the tortfeasor is legally responsible for the victim's injury, the tortfeasor is also responsible for any additional bodily harm to the victim resulting from the acts of others who provided medical care or other aid that the injury reasonably required, whether those acts were done in a proper or negligent manner.[63]

---

[62] *See, e.g.*, *Roderer v. Dash*, 233 P.3d 1101, 1110 (Alaska 2010).

[63] *See generally* RESTATEMENT (SECOND) OF TORTS § 457; *Thompson*, 290 P.3d at 401; *Lucas v. City of Juneau*, 127 F. Supp. 730, 731-32 (D. Alaska 1955); (continued...)

## D. Continuance-Related Attorney's Fees

### 1. Factual and procedural background

During discovery before the second trial, two of Central's depositions of Thompson's witnesses revealed that Thompson had earned income playing poker. Although these depositions took place on August 5 and 15, 2013, Central agreed at an August 15 status hearing that September 23, 2013 would be an appropriate start date for the second trial. Following that status hearing, the parties engaged in a discovery dispute about the disclosure of records of Thompson's poker playing, which culminated in a September 13 superior court order compelling Thompson to answer Central's interrogatories. That same day Central moved to continue the trial for several months so that it might have time to discover and prepare information related to Thompson's poker playing.

On September 19, four days before the scheduled start of the trial, the superior court granted Central's motion for a continuance. The court found that the evidence Central sought was relevant to Thompson's income, physical condition, and the extent of his injuries. But it also found that Central knew about Thompson's poker playing prior to the August 15 status hearing at which the trial date was set and did not raise it before the court until August 30, nor move for a continuance until ten days before the scheduled start of trial. To "minimize[]" any prejudice to Thompson, the superior court made Central responsible for the costs of the continuance and directed Thompson to provide an invoice of his costs.

Thompson's attorney filed the invoice, which included 36 hours of trial preparation that would have to be repeated due to the continuance; although he was

---

[63](...continued)
Judicial Council of California Civil Jury Instructions CACI No. 3929.

working on a contingent-fee basis, he estimated that a reasonable hourly fee would be $295. Central objected that attorney's fees were not a recoverable cost under Civil Rule 40(e) and that Thompson's attorney's rate was "inflated." The superior court found that the continuance-related "attorney fees for 36 hours of work at the rate of $295 per hour [were] reasonable" and ordered Central to pay those fees as well as Thompson's unavoidable travel and lodging expenses from the September trial date.

> **2.** **The superior court's award of costs and fees related to the continuance was within its powers under Civil Rule 40(e)(2) and was not an abuse of discretion.**

Central argues that the superior court abused its discretion by awarding costs at all when it continued the trial, exceeded its legal authority when it awarded attorney's fees under Civil Rule 40(e)(2), and abused its discretion by accepting Thompson's attorney's statement of his hours worked and reasonable hourly rate.

The trial court exercises significant discretion in evaluating motions to continue a trial date. Alaska Rule of Civil Procedure 40(e)(2) provides that if a "case is not tried upon the day set, the court in its discretion may impose such terms as it sees fit, and in addition may require the payment of jury fees and other costs by the party at whose request the continuance has been made." In this case the terms that the superior court saw fit to impose were shifting to Central Thompson's costs for travel, lodging, and his attorney's hours of trial preparation that would have to be duplicated.

Central argues that because the superior court did find that there was good cause to continue the trial it was inappropriate for the court to financially "punish[]" Central and "reward[]" Thompson. But although the superior court admonished Central for not bringing the issue of Thompson's poker earnings to the court's attention closer

to the time in mid-August that Central first realized it would be an issue,[64] the court's order granting a continuance explained that the purpose of requiring Central to pay Thompson's costs and fees was not to punish Central but to minimize prejudice to Thompson. Central's motion for a continuance came only ten days before the scheduled start of the trial and was granted the Thursday before a scheduled Monday start. In this context it was not an abuse of discretion to require the moving party to pay for these financial costs when it was responsible for the need to continue the trial so close to the date it was scheduled to begin.

We have previously held that trial courts have legal authority to condition a grant of a motion for a continuance on the moving party's agreement to pay the non-moving party's attorney's fees.[65] Rule 40(e)(2) gives trial courts the power to "impose such terms as it sees fit" and to "require the payment of jury fees and other costs" when granting a motion to continue a trial, and this power permits a court to hold a party that moves for a continuance shortly before trial responsible for the financial burden of duplicated trial preparation efforts.

Central's final argument challenging the fees awarded due to the continuance is that the superior court abused its discretion by accepting Thompson's counsel's statement that $295 per hour was a reasonable rate. The superior court was well positioned to evaluate the local costs of counsel and the particularities of this case,

---

[64]    *Cf. Greenway v. Heathcott*, 294 P.3d 1056, 1067 (Alaska 2013) ("[A] party who seeks to continue a case for trial must show that he acted with due diligence upon the grounds for which continuance is sought." (alteration in original) (quoting *Azimi v. Johns*, 254 P.3d 1054, 1061 (Alaska 2011))).

[65]    *See Varilek v. McRoberts*, Mem. Op. & J. No. 1321, 2008 WL 5192385, at *6-7 (Alaska Dec. 10, 2008); *Mely v. Morris*, 409 P.2d 979, 980 (Alaska 1966).

and it did not abuse its discretion by accepting Thompson's counsel's estimate of $295 as an appropriate hourly rate.[66]

### E.    Offer Of Judgment Attorney's Fees

The superior court granted Thompson attorney's fees under Civil Rule 68 as a prevailing party who received a judgment more favorable than his rejected offer of judgment.  Because we remand for a new trial, that attorney's fee award is necessarily vacated.  But because the propriety of the superior court's award calculation method could reappear as an issue in this case on remand, and because our view has implications for the parties' conduct during the ensuing proceedings, we address the proper application of Rule 68 awards in cases where the offeror is represented on a contingent fee basis.[67]

### 1.    Factual and procedural background

After our initial remand Thompson made an offer of judgment of $1,020,000 pursuant to Civil Rule 68(a).  Central did not accept the offer.  At the conclusion of the trial the jury returned a verdict of $1,458,430 for Thompson, which was "at least 5 percent less favorable to [Central] than the offer."[68]

Thompson moved for attorney's fees under Civil Rule 68(b).  Thompson's motion included his contract with his attorney, which established a contingency fee of

---

[66]    *Cf. Nautilus Marine Enters., Inc. v. Exxon Mobil Corp.*, 332 P.3d 554, 557 n.11 (Alaska 2014) (noting the $375 and $325 hourly rates of two Anchorage-based lawyers).

[67]    *Cf. ASRC Energy Servs. Power & Commc'ns, LLC v. Golden Valley Elec. Ass'n*, 267 P.3d 1151, 1168 (Alaska 2011) (considering the propriety of a vacated Rule 68 attorney's fees award "[t]o assist the parties in evaluating the case on remand and to avoid an unnecessary second appeal of the issue").

[68]    *See* Alaska R. Civ. P. 68(b).

45% of Thompson's gross recovery. Thompson maintained that because Civil Rule 68(b)(2) made Central responsible for "50 percent of the offeror's reasonable actual attorney's fees," he was entitled to a Rule 68 award of 22.5% of the gross judgment amounts.

The superior court first rejected Thompson's argument. It ruled that, contrary to an argument Central advanced, contingency fee agreements can be a proper basis for Rule 68 attorney's fee awards, but that in this case Thompson had failed to provide any principle by which the court could "accurately calculate the percentage of fees incurred after the settlement offer date," as Rule 68 requires. For that reason it awarded Thompson attorney's fees under Civil Rule 82 rather than Civil Rule 68.

Thompson moved for reconsideration and attached to his motion printouts from a timekeeping program his attorney used to record his efforts. These printouts suggested that Thompson's attorney had worked on the case for 60 hours after the remand but before the offer of judgment and for 573 hours between the offer of judgment and the end of trial. The superior court granted reconsideration and amended its final judgment to award Thompson attorney's fees under Civil Rule 68. It ruled that Thompson's documentation was sufficient to demonstrate that 90.5% of his attorney's post-remand efforts had occurred after the offer of judgment was rejected. And on this basis the superior court awarded Thompson Rule 68 attorney's fees calculated by multiplying Thompson's gross recovery by 45% (the total contingent fee), then by 90.5% (the percentage of the attorney's efforts that came after the offer of judgment was rejected), and then by 50% (the percentage of attorney's fees that Civil Rule 68(b)(2) awards).[69]

---

[69] The superior court subtracted the continuance-related attorney's fees already awarded under Civil Rule 40. Although our remand vacates the Civil Rule 68 (continued...)

**2. Civil Rule 68 attorney's fee awards must be based on actual hours worked after an offer of judgment is rejected, even when a party is represented on a contingent fee basis.**

Although only Central appeals the award, both parties fault the superior court's method of calculation. Central argues that because a contingent fee "cannot be apportioned from the date the offer was made" it is an improper basis for an award under Civil Rule 68(b), which requires payment of "reasonable actual attorney's fees incurred by the offeror from the date the offer was made." Thompson looks to the same feature of contingent fee arrangements and the same language from Rule 68(b) and draws the opposite conclusion: that in cases featuring contingent fees the entire fee is "incurred" at the time a judgment is entered, and therefore it is inappropriate to apportion it based on the hours worked before and after the offer.

" '[T]he purpose of Rule 68 is to encourage pretrial settlement' so as to save both the litigants and the state from the time and expense of a trial."[70] It serves this purpose by "rais[ing] the cost of litigation in the offeree's risk-benefit analysis, thus making settlement more attractive."[71] But rational risk-benefit analysis is only possible if parties that receive offers of judgment are able to accurately estimate the offeror's likely fees. When those fees are entirely determined by a private contingent fee agreement between the offeror and her attorney, the offeree cannot rationally analyze the risks and benefits of litigation.

---

[69](...continued) attorney's fee award, it does not disturb the Civil Rule 40 award, which was not based on Thompson's status as a prevailing party.

[70] *Froines v. Valdez Fisheries Dev. Ass'n* (*Froines II*), 175 P.3d 1234, 1237 (Alaska 2008) (quoting *Mapco Express, Inc. v. Faulk*, 24 P.3d 531, 542-43 (Alaska 2001)).

[71] *Id.* (quoting *Mackie v. Chizmar*, 965 P.2d 1202, 1205 (Alaska 1998)).

As both Central and Thompson note, contingent fee agreements also complicate a superior court's determination of what fees were "incurred by the offeror from the date the offer was made."[72] This case illustrates the point. The superior court calculated that 90.5% of Thompson's attorney's hours on the case occurred after the offer was made. But it limited its view to the time spent on the case following our initial remand. The superior court did not explain why the hours spent on the first trial and appeal were not relevant to determining what percentage of Thompson's attorney's effort came after the offer of judgment, even though Thompson had cited the procedural history of the case as a reason the 45% contingency fee agreement was reasonable. Inconsistencies like this are likely if the superior court is forced to artificially apportion contingent fees into portions earned "before" and "after" offers of judgment.

We have previously affirmed Rule 68 attorney's fee awards determined by the actual hours an offeror's attorney worked on the matter following the offer of judgment even when the attorney represented the offeror on a contingent basis. In *Okagawa v. Yaple* we rejected the argument that the text of Rule 68 "restricts an attorney's fees calculation to what the prevailing party is obligated to pay its attorney."[73] Instead, we held that "in certain situations attorney's fees awards may be calculated by multiplying a reasonable hourly rate by the attorney's time without necessarily considering how much the party actually owes the attorney."[74] We thus affirmed a Rule 68 award based on the hours the offeror's attorney worked on the case and a reasonable hourly rate, notwithstanding the fact that the offeror's attorney worked on a contingent basis.

---

[72] Alaska R. Civ. P. 68(b).

[73] 234 P.3d 1278, 1280 (Alaska 2010).

[74] *Id.*

Thompson argues that our decision in *Roderer v. Dash*[75] approved of Rule 68 awards based on contingency fee agreements. The superior court agreed with this reading of *Roderer*, and even our decision in *Okagawa* described *Roderer* as "suggesting that using contingency fee amount[s] as reasonable actual attorney's fees for a Rule 68 award was permissible."[76] But in *Roderer* we did not decide this question. Instead, we held that the superior court had erred by reducing the offeror's Rule 68 award by the percentage of total hours the *offeree's* attorney had worked on the case before the offer of judgment was made.[77] Because we held that the offeree had invited this error we did not directly resolve whether a contingent fee agreement is a proper basis for a Rule 68 award of attorney's fees.

In light of the purposes of Civil Rule 68 and our precedent interpreting its attorney's fee rules, it was error for the superior court to base the award on Thompson's contingency fee agreement. To effectuate the purposes of the Rule, any attorney's fees awarded under Civil Rule 68(b) must be determined by multiplying the hours the offeror's attorney or attorneys worked on the matter after the offer of judgment by a reasonable billing rate.

When the offeror is represented on a contingent fee basis the superior court must, with the benefit of briefing from the parties, determine the reasonable hourly rate. We have previously advised that "[t]he factors listed in Alaska Bar Rule 35(a) may be helpful to assess the reasonableness of counsel's requested hourly rate,"[78] and we

---

[75] 233 P.3d 1101 (Alaska 2010).

[76] *Okagawa*, 234 P.3d at 1281 n.21.

[77] *Roderer*, 233 P.3d at 1113-14.

[78] *Valdez Fisheries Dev. Ass'n v. Froines* (*Froines III*), 217 P.3d 830, 833
(continued...)

specifically note that one of the factors that Rule 35(a) considers is "whether the fee is fixed or contingent."[79] We have also previously noted that "the 'contingency factor' can reduce the disincentive for attorneys to represent claimants" who could not afford to pay hourly rates.[80] This is an important function of contingent fee agreements and may mean, in the context of Rule 68 litigation, that a reasonable hourly rate for an attorney who is only paid if her client recovers a judgment is higher than the rate of an equally talented attorney whose fee is due win or lose.[81] Making such a determination is within the trial court's "considerable discretion in determining the amount of fees that should be considered reasonable."[82]

## V.    CONCLUSION

We REVERSE the superior court's ruling refusing to permit any evidence that Thompson was assaulted after his surgery, and we REMAND for a new trial. We therefore VACATE the award of attorney's fees under Civil Rule 68. We AFFIRM the

---

[78](...continued)
n.17 (Alaska 2009).

[79]    Alaska Bar R. 35(a)(8).

[80]    *State, Dep't of Revenue v. Cowgill*, 115 P.3d 522, 524 (Alaska 2005) (citing *Wise Mech. Contractors v. Bignell*, 718 P.2d 971, 975 (Alaska 1986)).

[81]    *See id.* at 524-25 (approving an hourly billing rate for a plaintiff's attorney that exceeded the highest rates charged by defense attorneys in the same matter); *Wise*, 718 P.2d at 975 n.9 ("An example illustrates the point. If an attorney wins three out of every five cases and is limited to the ordinary hourly rate, say $100, on his victorious cases, and receives no fee in the cases which are lost, his overall hourly compensation is $60 rather than $100, assuming the same amount of time is spent in each case.").

[82]    *Kenai Chrysler Ctr., Inc. v. Denison*, 167 P.3d 1240, 1261 (Alaska 2007); *see also Froines III*, 217 P.3d at 833 (directing the trial court to "exercise its discretion to determine whether the fees claimed are objectively reasonable").

superior court's ruling limiting the testimony of Dr. Scher, its additional harm jury instruction, and its award of attorney's fees under Civil Rule 40.